EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* LUCAS TORRES MONTAÑEZ, acusado y apelante.

*Número:* CR-76-246        *Resuelto:* 13 de septiembre de 1977

*Carmen Ana Rodríguez Maldonado,* abogada del apelante; *Héctor A. Colón Cruz, Procurador General* y *Reina Colón de Rodríguez, Procuradora General Auxiliar,* abogados de El Pueblo.

PER CURIAM: El 27 de setiembre de 1974 el Ministerio Público acusó a Lucas Torres Montañez de asesinato en primer grado. El jurado lo declaró culpable de dicho delito y el tribunal lo sentenció el 19 de mayo de 1975 a reclusión perpetua. El acusado plantea ante nos que la evidencia presentada en su contra no sostiene un veredicto de asesinato en primer grado.

El señalamiento de error es inmeritorio. Angel Dalmau, único testigo ocular de los hechos, declaró que se dirigía en la madrugada del 15 de junio de 1974 a la casa de su madre en Villa Palmeras; que oyó un disparo y miró hacia la calle Laguna sin ver a nadie; que se metió a un callejón que conduce a un negocio llamado Bala de Bronce y al alcanzar la salida de aquél escuchó un segundo disparo; que acto seguido vio al apelante y a la víctima, Juan de Jesús Márquez. (T.E. págs. 27–34.) Juan caminaba hacia atrás, de frente al acusado. La distancia entre ellos en ese momento era de diecisiete pies. Escuchó a la víctima exclamar: "No tires, 'brother'." El acusado continuó su avance y a medida que él y la víctima se alejaban, el testigo caminaba acercándose a ambos. Finalmente el apelante le disparó tres veces a Juan de Jesús. De Jesús cayó arrodillado, recostado sobre la goma de una guagua. El apelante se acercó y golpeó a la víctima con la pierna. El testigo observó estos hechos a una distancia de aproximadamente treinta pies. (T.E. págs. 34–38.)

El apelante se dirigió inmediatamente al testigo, a quien conocía, y le pidió que hiciera "buche" (que callase). Le entregó un revólver, expresándole que llamaría a Félix, el hermano del occiso, y que si Félix "se ponía guapo . . . también le tiraba." (T.E. pág. 39.) Fueron a casa de Félix de Jesús y el acusado le expresó a éste que Dalmau tuvo que matar a su hermano, Juan de Jesús, con cinco disparos porque Juan había tratado de matar al acusado. El acusado y el testigo partieron luego para la casa de este último, donde horas más tarde el apelante le requirió al testigo "que me echara el caso

que como yo era menor a mí no me hacían nada." (T.E. págs. 39–42.)

El testigo Félix de Jesús corroboró la visita a su hogar y lo ocurrido allí. Señaló también que en ese momento el testigo Dalmau llevaba un peinado afro grande y el acusado uno bajito. (T.E. págs. 175–179.)

La señora Dolores Padilla declaró que se hallaba durmiendo cuando oyó tres disparos cerca de su hogar y una voz que le dijo: "Doña Lolita, me mataron." Identificó la voz como la de Juan de Jesús. Se asomó por la ventana y vio una persona con pelo corto que a su juicio no podía ser el testigo Dalmau. (T.E. págs. 152–158.)

No se presentó prueba de defensa. El tribunal le impartió al jurado instrucciones no objetadas sobre los elementos imprescindibles para probar el delito de asesinato en los dos grados que la ley establece. (¹)

---

(¹) El Derecho Común no reconoce grados de asesinato. 1 Wharton, *Criminal Law and Procedure*, Anderson, ed. 1957, sec. 263, pág. 558. Compárese: *The Homicide Act 1957*, 8 Halsbury, *Statutes of England*, 3ª ed. 1969, sec. 1 *et seq*. El Código Penal vigente en Puerto Rico hasta comienzos de siglo tampoco distinguía entre grados de asesinato. Orozco y Arascot, *Código Penal de 1879 para las Islas de Cuba y Puerto Rico*, Habana, 1879, Art. 414. Tal sigue siendo la situación en España. Cuello Calón, E., *Derecho Penal*, Tomo II, vol. 2º, 13ª ed. 1972, pág. 495 *et seq*. Para la práctica francesa, véase: *Codes et Lois Usuels (Codes d' Audience)*, Dalloz, 36ᵉᵐᵉ ed. 1975, "Code Penal", Art. 295 *et seq*.

En abril 22 de 1794 Pennsylvania se convirtió en el primer estado de la Unión que dividió el asesinato en grados, estableciendo a su vez diferencia en la pena. 4 Journal of the Senate 242 (Pa. 1794), Keedy, *History of the Pennsylvania Statute Creating Degrees of Murder*, 97 U. Pa. L. Rev. 759 (1949). La evidencia recopilada por este autor indica que este arreglo surgió como un resultado de la creciente preocupación por el rigor excesivo que implicaba la imposición de la pena de muerte a los convictos de cierto tipo de asesinato. Sobre la posible influencia que los dogmas eclesiásticos de la época hayan podido tener en el establecimiento de distinciones entre delitos y grados de los mismos a base del elusivo criterio del estado de la mente del autor, véase Turner, *The Mental Element in Crimes at Common Law*, 6 Cambridge L.J. 31 (1938) según citado en Josseff, *Intent to Kill as Affecting the Degree of Murder*, 24 So. Cal. L. Rev. 288, 289 (1951).

En 1856 California añadió los términos del Código de Pennsylvania a su propio estatuto. Más tarde, en 1872, se adoptó el Código Penal incor-

■ Como expresamos en *Pueblo* v. *Pérez Martínez*, 84 D.P.R. 181, 184 (1961), "La diferencia entre los dos grados de asesinato consiste en que en el asesinato en primer grado la muerte se realiza con malicia premeditada y deliberada mientras que en el de segundo grado la muerte es maliciosa y premeditada pero sin que medie deliberación." El elemento diferenciador básico de los dos grados de asesinato es la deliberación. *Pueblo* v. *Blanco*, 77 D.P.R. 767, 773–774 (1954).(²)

■ Hemos afirmado que la deliberación es "la resolución . . . de matar, después de darle alguna consideración; pero cualquier período de tiempo, por corto que sea, es suficiente para que pueda tener lugar la deliberación. Ese lapso, sostienen las autoridades, puede ser tan rápido como el pensamiento." *Pueblo* v. *Rosario*, 67 D.P.R. 371, 375 (1947). Al mismo efecto: *Pueblo* v. *Merced Jiménez*, 100 D.P.R. 270, 281 (1971); *Pueblo* v. *Ramos Padilla*, 88 D.P.R. 384, 388 (1963). La malicia premeditada y aun la deliberación pueden concebirse en el momento mismo de la realización del ataque. *Pueblo* v. *Román*, 70 D.P.R. 50, 54 (1949).

■ No existe presunción de ley a base de la cual pueda

porando el esquema estatutario de Pennsylvania al definir el asesinato en general, tal como hacían las reglas del *Common Law*, y luego dividido en grados. Pike, *What is Second Degree Murder in California*, 9 So. Cal. L. Rev. 112, 117 (1936), Josseff, *op. cit.*, pág. 290.

En Puerto Rico se calcó en 1904 esta distinción del Código Penal de California. West's Anno. Cal. Codes, Penal, sec. 189. La mayoría de los estados de la Unión Americana dividen en grados el referido delito, aunque en varios se mantiene la Regla del Derecho Común. 1 Wharton, *Criminal Law and Procedure*, supra, pág. 559. En años recientes existe una tendencia en Estados Unidos y otros países a eliminar los grados del delito de asesinato. Silving, Helen, *Criminal Justice*, vol. II, 1971, pág. 708. En Puerto Rico, al adoptarse el Código Penal de 1974, se mantuvo la distinción existente.

(²)Véase el Art. 201 del Código Penal de 1937, 33 L.P.R.A. sec. 633, que es la disposición aplicable a este caso. El Art. 83 del Código vigente, 33 L.P.R.A. sec. 4002, emplea la misma terminología en el aspecto que aquí nos ocupa, aunque efectúa otros cambios que no afectan la situación presente.

demostrarse que se ha actuado con malicia premeditada y deliberación. Ello vulneraría la presunción de inocencia que establece el Art. II, Sec. 11 de nuestra Constitución. *Pueblo* v. *Túa*, 84 D.P.R. 39, 53–54 (1961); *Pueblo* v. *De Jesús Santana*, 100 D.P.R. 791, 801 (1972). De las circunstancias en que se produce un asesinato puede deducirse racionalmente, pero no presumirse, la deliberación.(³) *Pueblo* v. *Merced Jiménez*, supra, 281; *Pueblo* v. *Blanco*, supra, 774.

■ La prueba necesaria para controvertir la presunción de inocencia no tiene que ser de orden directo. Art. 462 del Código de Enjuiciamiento Civil, 32 L.P.R.A. sec. 1885; *Pueblo* v. *López Rodríguez*, 101 D.P.R. 897, 898–899 (1974).

■ La presencia o ausencia de deliberación es una cuestión de hecho a ser resuelta por el jurado. *Pueblo* v. *Merced Jiménez*, 100 D.P.R. 270, 281 (1971). En el caso de autos existía prueba suficiente para que el jurado pudiese inferir que estaban presentes todos los elementos del asesinato en primer grado. Desfiló prueba sobre la existencia de cinco disparos, tres de ellos separados de los otros. Antes de los tiros fatales la víctima retrocedió un trecho considerable ante el avance del matador, implorándole que no disparase. Después de herir mortalmente a la víctima el acusado la golpeó. Una vecina declaró que la persona que había visto junto a la víctima no era el testigo ocular de los hechos y principal declarante de cargo. La conducta posterior del acusado también es relevante. Ante este conjunto de hechos, sería improcedente nuestra intervención con la apreciación de la prueba

---

(³) La diferencia no es una de carácter semántico solamente. Recuérdese que tratándose de una presunción, una vez se establecen los hechos que la ley estatuye como base para lo que habrá de concluirse, el juzgador de los hechos viene obligado a decidir de acuerdo con esa presunción en ausencia de evidencia que la contravierta. Si es una inferencia, el establecimiento de los hechos que puedan servirle de base a la misma no fuerza de manera inevitable conclusión alguna y por lo tanto el acusado continúa en posición idéntica a la que tenía al comienzo del juicio, es decir, presumiéndosele inocente y sin ninguna obligación de proveer prueba a su favor.

que hizo el tribunal de instancia, en ausencia de pasión, prejuicio, parcialidad o error manifiesto. *Pueblo* v. *Colón Obregón,* 102 D.P.R. 369, 372 (1974) ; *Pueblo* v. *Rodríguez González,* 101 D.P.R. 1, 4 (1973).

*Se confirma la sentencia apelada.*

El Juez Asociado Señor Carlos V. Dávila concurre en el resultado sin opinión.